IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs December 11, 2018

**STATE OF TENNESSEE v. JAMES DOMINIC STEVENSON**

**Appeal from the Circuit Court for Marshall County**
**No. 16-CR-11     Franklin L. Russell, Judge**

_____

**No. M2017-01514-CCA-R3-CD**

_____

The defendant, James Dominic Stevenson, appeals his Marshall County Circuit Court jury convictions of attempted first degree murder, aggravated assault, and reckless endangerment involving the use of a deadly weapon. He challenges the sufficiency of the evidence as to the element of identity. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, and J. ROSS DYER, JJ., joined.

Matthew D. Wilson, Mississippi State, Mississippi, for the appellant, James Dominic Stevenson.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Robert J. Carter, District Attorney General; and Weakley E. Barnard and William Bottoms, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The Marshall County Grand Jury charged the defendant with the attempted first degree murder of his ex-girlfriend; alternative counts of the aggravated assault of his ex-girlfriend by use or display of a deadly weapon,[1] by causing bodily injury, and by violation of a restraining order; reckless endangerment of his ex-girlfriend's young son;

---

[1]     The Grand Jury charged the defendant with one count of assault by use or display of a deadly weapon, *see* T.C.A. § 39-13-101, but the trial court granted the State's motion to amended this charge to aggravated assault by use or display of a deadly weapon, *see* T.C.A. § 39-13-102.

and first degree murder of an unborn fetus. The State later dismissed the charge of first degree murder of an unborn fetus.

At the April 2017 trial, Dixie Matthews, the victim, testified that she met the defendant in February 2014, and they began a romantic relationship. Ms. Matthews had a son, Giovanni Matthews, from a previous relationship who was born around the same time that Ms. Matthews and the defendant met. Although Ms. Matthews and the defendant lived together for a few months in 2015, Ms. Matthews maintained a separate residence throughout their relationship. She described her relationship with the defendant as "rocky." In March of 2015, Ms. Matthews ceased residing with the defendant, and the City Court of Lewisburg issued an order restraining the defendant from contact with Ms. Matthews; however, Ms. Matthews testified that she and the defendant continued to see each other despite the restraining order until their relationship ended "towards the end of August" 2015.

Ms. Matthews testified that, on August 30, 2015, she was released from jail on bond for "[t]heft of a credit card." She acknowledged that she had since been convicted of the offense and was on probation at the time of the trial. Ms. Matthews stated that the defendant contacted her on September 4, 2015, after he had seen a posting on Facebook in which Ms. Matthews stated that she was pregnant. At the time, Ms. Matthews believed that she was 10 weeks pregnant by a "guy friend" with whom she had had a relationship after March 2015. On September 4, the defendant contacted Ms. Matthews by text message, bringing up her pregnancy. Ms. Matthews did not immediately respond to the defendant's text message but sent a reply text message later that night. The defendant contacted Ms. Matthews again on the morning of September 5 by text message, asking whether he was the father of Ms. Matthew's unborn child. Ms. Matthews testified that she communicated with the defendant via telephone calls and by text messages on September 5.

A series of text messages from September 4 and 5 between Ms. Matthews and the defendant were exhibited to Ms. Matthews' testimony and shown to the jury. Ms. Matthews explained that during the time of those text messages, she was in the process of moving from Lewisburg to Lawrenceburg. During a text message conversation on September 5, Ms. Matthews stated that her "iPhone almost had it[;] it keeps blacking out and [the] spe[a]ker quit working." Later, in that same text message conversation, the defendant asked whether he could "see Giovanni" that night, to which Ms. Matthews responded, "Yea when we get back to [L]ewisburg[.]" At approximately 9:55 p.m., Ms. Matthews and the defendant had the following conversation via text messages:

[Ms. Matthews:] We coming into [L]ewisburg now[.]

-2-

[The defendant:] I'll be ready[.]

[Ms. Matthews:] K give us about 5 minutes[.]

[The defendant:] Ok[.]

Ms. Matthews testified that she also had a telephone conversation with the defendant during the same period that they were text messaging each other, and the defendant told her that "he was over at his friend's house" and that she should meet him at the Marshall County Plaza ("the Plaza") located at 1570 Old Columbia Highway.

Ms. Matthews testified that she arrived at the Plaza at approximately 10:15 p.m. on September 5 with Giovanni secured in an infant car seat in the back seat of her vehicle on the passenger's side. When Ms. Matthews arrived at the Plaza, she "pulled in on the side of the building," and the defendant "came outside the bushes and got in [her] passenger seat." Ms. Matthews stated that she could clearly see the defendant's face because the dome light in her vehicle came on when he opened door. The parking lot of the Plaza also had lights that illuminated the area where Ms. Matthews had stopped her vehicle. The defendant then "told Giovanni that this [wa]s the last time" the defendant would see them, and Ms. Matthews recognized the defendant's voice when he spoke. Ms. Matthews testified that the defendant then "hit [her] in the head with a hard object." She began "crying and told him [she] didn't have time to start fighting with him." Ms. Matthews described what happened next: "He just reached behind me still, playing with Giovanni, and that's when I heard the clicking sound." She "happened to glance over and . . . noticed that [the defendant] had a gun in his hoodie pocket." Ms. Matthews stated that, prior to this incident, she had never seen the defendant with a handgun. She told the defendant to get out of her vehicle, which the defendant did. The defendant, standing one or two steps away from the vehicle, then aimed the gun at Ms. Matthews and fired, shooting Ms. Matthews in her "lower right jaw." Ms. Matthews began to drive forward, which caused her cellular telephone to fall "underneath [her] foot," so she stopped the car to pick up the phone. At that time, the defendant "ran back over and came through the passenger door and snatched [the] phone" from Ms. Matthews and "ran toward the bushes." The defendant slipped, regained his balance, and fired a second shot, which hit the driver's side window of Ms. Matthews' vehicle.

Ms. Matthews drove away from the scene and stopped at a nearby house where two men were outside. She asked them to call 9-1-1 but inferred that the men did not speak English and could not understand her. She then drove to the police station and honked her car horn, but no one responded. Next, she drove to a tennis court on Jones

Circle to find her boyfriend, but he was not there so she asked two other people to call 9-1-1. Ms. Matthews then drove to Marshall County Medical Center ("MCMC"). She was later transported to Vanderbilt Medical Center by helicopter, where she remained for four or five days. Ms. Matthews testified that the bullet fractured her mandible and lodged in the bone, and the doctors were unable to remove all of the bullet fragments for fear of causing greater damage. Ms. Matthews identified with 100 percent certainty that the defendant was the person who shot her.

On cross-examination, Ms. Matthews testified that the telephone she had used to communicate with the defendant was an AT&T iPhone. She agreed that everything she had stated in her text messages to the defendant was true and accurate and that the text messages exhibited to the jury were all of the messages sent between the defendant and her. She estimated that she and the defendant had also communicated by telephone "about three or four times" the night of September 5 and that the defendant had initiated each of those calls. Ms. Matthews acknowledged that, because of her training as a certified nursing assistant, she understood the severity of her injury yet drove to three different locations before going to the emergency room. She explained that she drove to the tennis court to find her boyfriend to watch Giovanni while she sought medical treatment. Despite seeing two friends at the tennis court and asking them to call 9-1-1, she did not ask either of them to accompany her to the hospital. She acknowledged that she knew that she was at risk of passing out if she lost too much blood.

Lewisburg City Police Department Detective Santiago McKlean testified that he responded to a shooting at the Plaza. During his investigation he collected two shell casings, broken glass, and Ms. Matthews' cellular telephone from the scene. He described the parking lot at the Plaza as being illuminated at night. At the location where Ms. Matthews first stopped after the shooting and asked two men to call 9-1-1, Detective McKlean observed "blood on the curb" and "on the sidewalk going toward the yard." Detective McKlean testified that he developed a suspect in the shooting but was not able to locate the suspect that night; he did not locate a weapon that night. Detective McKlean interviewed Ms. Matthews at the Vanderbilt Medical Center Intensive Care Unit the following day.

During cross-examination, Detective McKlean testified that he did not obtain images of a listing of Ms. Matthews' telephone calls from her cellular telephone. He subpoenaed the phone records from AT&T for the defendant's and Ms. Matthews' telephone numbers, but he stated that he had no evidence of telephone calls between the defendant and Ms. Matthews other than Ms. Matthews' statement to that effect.

Tennessee Bureau of Investigation Crime Laboratory Agent Jessica Hudson, an expert in ballistics and cartridge shell casing identification, testified that the two shell casings collected in this case were .25 auto caliber and were fired from the same gun. On cross-examination, she explained that the gun involved in this case had not been previously recorded in the National Integrated Ballistics Information Network, which is a database used for determining "if a particular gun has been used in a different crime."

Other State witnesses testified to matters not relevant to this appeal. The defendant did not testify and did not present any evidence.

On this evidence, the jury convicted the defendant as charged, and the trial court merged the alternative verdicts of aggravated assault into the conviction for attempted first degree murder. Following a sentencing hearing, the trial court sentenced him to an effective sentence of 27 years' incarceration.

The defendant filed a timely but unsuccessful motion for new trial followed by this timely appeal. In this appeal, the defendant challenges the sufficiency of the evidence; specifically, the defendant argues that "uncontroverted evidence . . . rebut[ted] the essential element of identity." The defendant asserts that the only evidence linking the defendant to the offenses was Ms. Matthews' testimony, which, the defendant contends, was unreliable because Ms. Matthews was "an admitted fraudster." The State argues that the evidence is sufficient to support the jury's verdicts. We agree with the State.

We review the defendant's claim of insufficient evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as

well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"The identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975)). Whether the State has established the defendant as the perpetrator of the charged offenses beyond a reasonable doubt is "a question of fact for the jury upon its consideration of all competent proof." *State v. Bell*, 512 S.W.3d 167, 198 (Tenn. 2015) (citing *State v. Thomas*, 158 S.W.3d 361 app. at 388 (Tenn. 2005)); *accord State v. Crawford*, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982) (citing *Stubbs v. State*, 393 S.W.2d 150, 153 (Tenn. 1965)).

Here, the proof adduced at trial established that the defendant met Ms. Matthews at the Plaza, got into her vehicle, struck her in the head, fired one bullet that hit her in the jaw, and fired a second bullet that hit the driver's side window of her vehicle. Ms. Matthews identified the defendant as the person who shot her. Ms. Matthews' testimony and her text messages with the defendant showed their plan to meet on the night of September 5, 2015. Ms. Matthews stated that she and the defendant spoke by telephone and arranged to meet at the Plaza. Ms. Matthews testified that the lights in the parking lot as well as the dome light in her vehicle allowed her to see the face of the defendant clearly and that she recognized his voice when he spoke. Ms. Matthews testified that she was 100 percent certain that the defendant was the person who shot her.

The defendant contends that Ms. Matthews' admission that she committed fraud in an unrelated matter damaged her credibility to the point of her testimony being insufficient to support his conviction. The defendant also argues that a text message sent from Ms. Matthews to the defendant indicating that the speaker on her cellular telephone was broken belies her testimony that she and the defendant spoke by telephone to arrange a meeting place. The jury heard all of this evidence and clearly believed Ms. Matthews' testimony, as was their prerogative. Questions of witness credibility and all factual issues are resolved by the jury. *See State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

On these facts, a rational trier of fact could have found beyond a reasonable doubt that the defendant was the perpetrator of these crimes.

Accordingly, the judgments of the trial court are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE